IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

RONNIE W. DALTON, II                                                                     PLAINTIFF

v.                                   Civil No. 09-2033

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                         DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Ronnie Dalton, II, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for supplemental security income ("SSI) under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.      Procedural Background**

The application for SSI now before this court was filed on July 17, 2003, alleging an onset date of May 15, 2001, due to hand, leg, and back pain, as well as depression. (Tr. 12, 58, 70, 84). An administrative hearing was held on December 15, 2005. (Tr. 366-395). On May 23, 2006, the ALJ entered an unfavorable decision. (Tr. 12-23). That decision was appealed to this Court, and an order remanding the case to the Commissioner was entered on July 18, 2007. (Doc. 9-1). The Appeal Council then vacated the ALJ's decision and remanded it for rehearing. (Tr. 428). A second administrative hearing was held on September 11, 2007. (Tr. 604-657). Plaintiff was present and represented by counsel.

At the time of the second administrative hearing, plaintiff was 39 years old and possessed a tenth grade special education. (Tr. 12, 612). The record reveals that he had past relevant work ("PRW") experience as a tile helper. (Tr. 1, 74, 79, 612, 614-619).

On September 24, 2008, the ALJ found that plaintiff's disorder of the back, mood disorder, anxiety disorder, substance abuse disorder, and attention deficit hyperactivity disorder were severe impairments, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 407-412). However, she also determined that plaintiff's alcohol and/or drug abuse was a contributing factor material to the determination of disability. (Tr. 415). Absent the effect of this abuse, the ALJ found that plaintiff retained the residual functional capacity ("RFC") to lift or carry ten pounds frequently and twenty pounds occasionally; to stand, walk, or sit for a total of six hours during an eight-hour workday; to occasionally reach overhead, but could never drive or climb scaffolds, ladders, and/or ropes, and must avoid exposure to unprotected heights, dangerous equipment, and machinery. (Tr. 417-419). Mentally, she also concluded that plaintiff could perform activities involving simple reading and writing with non-complex simple instructions that require little judgment; are routine, repetitive, and learned by rote with few variables; involve superficial contact with the public and co-workers that is incidental to the work performed; and, requires concrete, direct, and specific supervision. With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a small products assembler and machine tenderer. (Tr. 419).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on February 4, 2009. (Tr. 396-398). Subsequently, plaintiff filed this action. (Doc. # 1).

This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 9, 10).

**II.    Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3),

1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.   Discussion

After reviewing the medical evidence of record, the undersigned finds that the ALJ's RFC is not supported by substantial evidence. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court

4

of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

Records indicate that plaintiff has been hospitalized on numerous occasions for suicidal ideations and depression. In January 2000, plaintiff was admitted to Harbor View Mercy Hospital due to intense suicidal ideations. (Tr. 335-341, 486-511). Plaintiff was diagnosed with major depression, alcohol dependence, and possible attention deficit disorder with a global assessment of functioning ("GAF") score of 25, indicative of an inability to function in all areas. He responded well to conservative treatment and was discharged on February 2, 2000, with diagnoses of major depression, ADD, alcohol dependence, and paranoid traits with a GAF of 55. Following discharge, plaintiff began experiencing negative, lonely feelings and ultimately overdosed on Ritalin. (Tr. 329-334). He became progressively more disturbed, increasingly paranoid, and disorganized. Plaintiff was readmitted on February 4, 2000, with diagnoses of paranoia secondary to excessive doses of Ritalin, alcohol dependence, major depression, and ADD with a GAF of 20, indicating that he posed a danger to himself or others. He was treated via individual and group psychotherapy, as well as chemical dependency education group, medication, and occupational therapy. Due to improvement, plaintiff was transferred to a residential treatment facility on February 14, 2000. (Tr. 329-334, 465-485). After his release, plaintiff followed up with both individual and group therapy. (Tr. 120-128, 299-315).

On August 26, 2002, plaintiff presented at the Emergency Room due to chest pressure and shortness of breath. (Tr. 181-182). He indicated that he had become quite anxious after being released from Harbor View Mercy Hospital ("HVMH") that morning. Although he denied homicidal or suicidal ideations, plaintiff reported feeling "a little paranoid." (Tr. 181). Dr. Hamby gave him injections of Versed and Vistaril and advised plaintiff to follow-up with HVMH the following morning. (Tr. 182).

On September 25, 2002, plaintiff was again admitted to HVMH and treated for depression and suicidal ideations. (Tr. 137-151, 178-180, 317-328, 457-464). He indicated that he had been hospitalized in the past for psychiatric treatment and was currently taking Prozac. (Tr. 330-341). Plaintiff reported a history of drug and alcohol abuse resulting in depression and suicidal ideations. (Tr. 139). Records indicate that he had begun drinking alcohol at the age of 7. He had also recently used methamphetamine and cocaine. (Tr. 144). Drug testing was positive for benzodiazepines. A mental status examination showed normal intelligence, limited cognitive abilities, frustrated easily, good recent memory, fair long-term memory and concentration, fair insight, and poor judgment. (Tr. 146-147). Dr. Veena Vadmal prescribed Effexor. (Tr. 139). He experienced drowsiness and initial difficulty adjusting to Effexor, so Effexor XR was prescribed. Gradually plaintiff started responding well to the medication and was moved to the adult unit to attend groups. Plaintiff was discharged on October 1, 2002, with final diagnoses of major depression, dysthymia, polysubstance abuse, methamphetamine dependancy, and dependent personality traits. He was assessed with a global assessment of functioning ("GAF") of 20 upon admission; 35 upon discharge; and, highest in the past year of 60. (Tr. 137-139).

Plaintiff was seen for a psychological examination by Dr. Patricia Walz, on October 27, 2003. (Tr. 233-237). He reported that he had been treated for mental issues and suicidal ideations at HVMH, and also reported a family history of alcohol and physical abuse. (Tr. 233-234). Plaintiff also admitted that he had a criminal history involving DWI and public intoxication. (Tr. 234). Further, he indicated that he had attended ten AA/NA support meetings per week, some organized meetings at his church, and recovery classes. (Tr. 236). Dr. Walz estimated plaintiff intelligence as low average. She diagnosed plaintiff with dysthymia; alcohol abuse, reportedly in remission for 70 days; ADHD by history; and, personality disorder with schizoid and borderline traits. (Tr. 236). Dr. Walz noted that plaintiff had difficulty staying on task and had some social functioning issues and rated his prognosis as guarded, if he abstained from alcohol. (Tr. 236-237).

Plaintiff was followed by the Western Arkansas Counseling and Guidance Center from March 25, 2004 through November 18, 2004. (Tr. 277-279, 290). An initial evaluation was performed on March 25, 2004, by Jerry Stearman, a licensed psychological examiner. (Tr. 288-290). Plaintiff reported abusing alcohol since the age of 10, but stated that he had stopped drinking in the past six months. (Tr. 289). He also indicated that he had undergone drug and alcohol treatments at HVMH, Harbor House, and St. Edwards treatment facilities. (Tr. 289). Plaintiff's intelligence was estimated to be average. He was diagnosed with adjustment disorder with mixed anxiety, alcohol dependence in remission, personality disorder not otherwise specified, back problems, bone spurs, and allergies, and was noted to have a GAF of 55. (Tr. 290). Dr. Pearl Beguesse prescribed Ritalin LA. (Tr. 282, 285). Plaintiff was dropped from service on November 18, 2004, because he had dropped out of treatment. (Tr. 279).

Plaintiff saw Dr. Denise LaGrand for a psychological examination on April 12, 2004. (Tr. 269-275). He reported using alcohol and methamphetamine within the last year; as well as a history of using marijuana, cocaine, and "downers." (Tr. 271). Plaintiff also admitted self medicating with alcohol. He indicated that he had received treatment for drug and alcohol abuse approximately four years prior. (Tr. 271). Examination showed plaintiff to be well oriented, with low-average memory and good judgment. (Tr. 272-273). Dr. LaGrand noted that plaintiff's gait and posture were normal, and that he did not appear to have any physical limitations. (Tr. 269). She then diagnosed plaintiff with major depression, rule out specific learning disabilities, and polysubstance abuse/dependence in remission by report. (Tr. 273). Dr. LaGrand indicated that plaintiff's GAF was 60, characteristic of moderately severe symptomology. (Tr. 273).

On November 22, 2005, plaintiff was voluntarily admitted to Vista Health for suicidal ideation and anxiety. (Tr. 350-365, 555-585). He stated that he planned to "drink and then shoot himself with his shotgun which he hid in the woods." Plaintiff reported that he had been treated in the past for alcoholism and depression, and reported that he had been binge drinking for years, as well as using other drugs. (Tr. 350). Blood tests were positive for methamphetamine and propoxyphene use. Dr. Lewis Britton diagnosed plaintiff with bipolar II disorder, alcohol dependance, personality disorder, back pain by history, and a GAF of 41. (Tr. 352). To treat plaintiff's physical and psychological symptoms, he prescribed Seroquel, Cymbalta, Darvocet, Tylenol, Ativan, and Sonata. Dr. Britton noted some improvement during plaintiff's stay but indicated that he remained garrulous, markedly loosened in associations, and was, at times, difficult to follow. He believed plaintiff's affect reflected a distinct state of hypomania. By

8

November 30, 2005, plaintiff's condition had improved and he was released and encouraged to attend AA meetings. (Tr. 351). Plaintiff's GAF upon discharge was 41. (Tr. 352, 557).

On May 22, 2006, plaintiff was voluntarily admitted to Vista Health by referral from the Ozark Guidance Center. (Tr. 545-554). Plaintiff stated that he had gotten into a fight with his father and had to leave home in St. Paul and move back with his mother in Fort Smith. He presented at the Washington Regional Medical Center emergency room on May 20, 2006, tearful and with a plan to commit suicide by "cutting himself." Records indicate he had been off medications for an unknown period of time. Plaintiff admitted that he had consumed a "few" alcoholic beverages that day, but later admitted to binge drinking. The psychiatric consult obtained in the ER indicated that plaintiff said he was going to cut himself or jump off a bridge. Plaintiff told them he had a chemical imbalance and had been treated with various medications. He indicated that he was doing well until January 2006 when he became unable to pay for his medications. Plaintiff reported getting upset frequently, maybe ten times per night, and not doing well. He complained of frequent tearfulness and feeling overwhelmed. Plaintiff also demonstrated multiple cuts on his upper arms and lower legs, most of which were scarred and healed, stating that he was not safe unless in the hospital. He reported constant anxiety with racing thoughts, irritability, and blow ups. However, plaintiff admitted that the had not kept appointments with Ozark Guidance Center. Plaintiff was diagnosed with bipolar disorder II, alcohol dependence, and personality disorder not otherwise specified. He noted that his explosiveness had been problematic prior to admission and continued to pose a problem for him. Plaintiff responded to treatment, appearing listless at times and talkative and rambling at others. He was motivated to attend AA and was no longer suicidal. His thinking process slowed

considerably and he became more subdued. Doctors noted he was not his usual "wired" self. He voiced minimal interest in Decision Point, and it was felt that he was attempting to sabotage his rehab possibilities. Plaintiff reported suicidal ideation, but his statements appeared to be disingenuous. He was labile, ranging from angry and non-compliant to apologetic and amenable. His impulse control remained significantly impaired. He also appeared to experience difficulty learning from experience. However, he did show improvement. Plaintiff was discharged June 16, 2006, to go to Decision Point. He denied suicidal ideation at this time and was responding well to medication. A therapeutic trial of Strattera was given. Plaintiff was overly bright, somewhat accelerated, not disorganized, and quite literal. His associations remained loosened, his social judgment was barely adequate, and his insight was superficial. Plaintiff's discharge medications were Seroquel, Depakote ER, Prilosec, Voltaren, Rozerem, Strattera, Cymbalta, Campral, and Flexeril. At this time his GAF was 42. (Tr. 545-554).

A certificate of completion from Decision Point indicates that plaintiff successfully completed a residential substance abuse treatment program on July 13, 2006. (Tr. 455).

On October 11, 2006, Stephanie Ellis, a nurse practitioner, completed a report of medical examination. (Tr. 601-603). She stated that he had a history of ADHD, anxiety, bipolar disorder, depression, acute mania episodes, reported compression fractures, GERD, and insomnia. His present complaints were acute anxiety and severe depression. She diagnosed him with bipolar disorder since 2002, acute anxiety since 2003, and secondary mania since 2005. Ms. Ellis indicated that plaintiff's primary impairment of bipolar disorder would prevent him from performing any gainful activity for the rest of his life. She indicated that he had followed treatment recommendations, but was unable to afford medications. Ms. Ellis stated that plaintiff

was in great need of assistance as he was a danger to himself and others without his medication. (Tr. 601-603).

On June 16, 2007, plaintiff presented in the emergency room stating that he had been hearing voices telling him to cut himself. (Tr. 524-544). He had superficial cuts on his upper extremities. Plaintiff had also run out of medication several months prior and could not afford to have his medications refilled. He indicated that the precipitating factor was that the following day was Father's Day and his ex-wife had left with their son and he would not be able to see him. Plaintiff stated that he did not generally drink, but had been drinking about a pint a day over the previous few days and had also been using multiple street drugs. His blood alcohol level was 0.159% upon admission and a urine screen was positive for barbituates, cocaine, and benzodiazepines. A psychiatric consult with Dr. Lance Foster revealed that plaintiff had not taken his psychotropic medications in the previous seven months. Plaintiff noted that his condition continued to worsen, describing voices telling him to cut or stab himself and to kill himself. He reported feeling depressed and suicidal with initial insomnia and periods of not sleeping at all. Plaintiff also stated that cutting relieved the voices temporarily. Working diagnoses of depression, bipolar disorder, polysubstance abuse, and self-mutilating behavior were given and plaintiff was assessed with a GAF of 16. On June 18, 2007, plaintiff was transferred to Vista Health. He responded well to treatment and was released on July 3, 2007, in stable condition. Upon discharge, plaintiff was to attend 12-step programs as instructed for 90 days, a rehabilitation program was recommended, and follow-up psychotherapy and medication management with OGC Crisis Center were prescribed. His final diagnoses were server bipolar II disorder without psychotic features, alcohol dependence with physiological

dependence, polysubstance dependence without physiological dependence, PTSD, ADHD by history, personality disorder, and a GAF of 50. His medications included Voltaren, Lunesta, Vicodin, Flexiril, Seroquel, Depakote ER, and Cymbalta. (Tr. 524-544).

While the ALJ did acknowledge plaintiff's diagnosis of bipolar disorder, she dismissed many of his symptoms because he used drugs/alcohol to self medicate and failed to take his medication as prescribed. In fact, she found as follows: "If the claimant's substance abuse was stopped, his mental impairments would not cause limitations that would more than minimally affect his ability to perform basic work activities." (Tr. 418). We note, however, that bipolar disorder can precipitate substance abuse as a means by which the sufferer tries to alleviate his symptoms. Frederick K. Goodwin & Kay Redfield Jamison, *Manic-Depressive Illness* 219-25 (1990); Li-Tzy Wu et al., "Influence of Comorbid Alcohol and Psychiatric Disorders on Utilization of Mental Health Services in the National Comorbidity Survey," 156 *Am. J. Psychiatry* 1235 (1999); Edward J. Khantzian, "The Self-Medication Hypothesis of Addictive Disorders: Focus on Heroin and Cocaine Dependence," 142 *Am. J. Psychiatry* 1259, 1263 (1985). At least one major study has shown that "more than forty-two percent of patients meeting the criteria for a major depressive disorder (including bipolar disorder) had lifetime histories of substance abuse." Kim S. Griswold and Linda F. Pessar, *Management of Bipolar Disorder,* 62 AM. FAMILY PHYSICIAN 1343, 1345 (2000). (Tr. 469). Therefore, the fact that substance abuse aggravates a plaintiff's mental illness does not prove that the mental illness itself is not disabling. *Brown v. Apfel,* 192 F.3d 492, 499 (5th Cir. 1999); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998).

12

Further, bipolar disorder (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease) may prevent the sufferer from taking his prescribed medicines or otherwise submitting to treatment. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders TR-IV*, 304, 321, 359 (4th ed. 2000); Donald M. Hilty et al., "*A Review of Bipolar Disorder Among Adults*," 50 *Psychiatric Services* 205-08 (1999); Mark Oflson et al., "*Bipolar Depression in a Low-Income Primary Care Clinic*," 162 *Am. J. Psychiatry* 2150 (2005). According to the DSM, patients suffering from schizophrenia, schizoaffective disorder, and bipolar disorder also suffer from anosognosia, or poor insight. *Id*. "Evidence suggests that poor insight is a manifestation of the illness, rather than a coping strategy. . . . This symptom predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness." *Id*.

After reviewing the entire evidence of record, we can not say that substantial evidence supports the ALJ's RFC determination. Given the fact that plaintiff has been diagnosed with bipolar disorder, which by its nature is a very complicated mental disorder, we believe that remand is necessary to allow the ALJ to develop the record further concerning the possible connection between plaintiff's mental impairment and his alcohol/drug use and medication non-compliance. It is clear that plaintiff's use/abuse of alcohol and drugs and medication non-compliance could be symptoms of his illness, rather than material factors contributing to his disability. Accordingly, on remand, the ALJ should direct interrogatories to plaintiff's treating

13

doctors asking them to provide their professional opinion as to whether plaintiff's drug and alcohol use and medication non-compliance are symptoms of his bipolar disorder.

If, on remand, the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow. *See* Social Security Administration Emergency Teletype, No. EM-96-94 at Answer 29 (Aug. 30, 1996), *quoted in Fastner v. Barnhart,* 324 F.3d 981, 986 (8th Cir.2003); Dru Stevenson, *Should Addicts Get Welfare?: Addiction & SSI/SSDI,* 68 Brook. L.Rev. 185, 194 & nn. 47-49 (2002).

### IV.  Conclusion

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 15th day of March 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)